VALENTINE HOWELL AND LORETTA B. HOWELL, PETITIONERS, *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 86581.    Filed October 4, 1963.

*Carl F. Bauersfeld*, for the petitioners.
*Henry G. Nagel*, for the respondent.

16

OPINION

OPPER, *Judge:* It may ordinarily be reasonable to assume that businessmen do not undertake a commercial venture except for the purpose of making a profit. In such a situation, although they may exercise bad judgment so that the prospects of a profitable operation are negligible or even absent, that alone would be an inadequate

18

criterion for determining the taxpayer's purpose. *Samuel Riker, Jr., Executor,* 6 B.T.A. 890 (1927) ; *James Otis,* 7 B.T.A. 882 (1927). The mere fact that a person invests his time or money, or both, may, without more, tend to show that it was his purpose to succeed even though a more detached judgment might indicate the likelihood of failure. We should not then substitute an objective conclusion of our own or try to determine what the "prudent" business decision should have been. *Edwin S. George,* 22 B.T.A. 189 (1931).

But on this record we cannot say that this principle should apply. "Whether the amounts presently in controversy are claimed as 'losses' or as ordinary and necessary business expenses, the existence of a profit motive on the part of petitioner is requisite." *Henry P. White,* 23 T.C. 90 (1954), affd. 227 F. 2d 779 (C.A. 6, 1955), certiorari denied 351 U.S. 939. Petitioner was in the 80-percent income tax bracket and any loss to him, if deductible in full, would be comparatively slight. On the other hand, the beneficiary of his enterprise was a relative and, presumably, a friend. And the excessive generosity of the terms of the agreement of partnership with this relative was such that it would, on analysis, require an incorrigible optimist to assume that any profit could flow to petitioner.

Disregarding the first year of operation, which may not be a reasonable test, and looking at the second and third years, both of which were available to petitioner as a measure of the prospects for the year before us, the second year would have required gross receipts of almost $87,000 before petitioner could hope to receive a single penny.[1] They were actually less than $30,000. The third year was even worse, for there the expenses, excluding the fixed compensation of petitioner's partner but considering the 25 percent of gross receipts to which she was entitled in addition to her fixed compensation, were 108 percent of total gross receipts. These would have had to reach infinity before there could be any return to petitioner. Perhaps the clearest approximation of the prospects is to average the 2 years. On this approach gross receipts of over $380,000 have been needed to allow anything for petitioner.[2] The record is completely

[1] This figure is based on a computation derived from the partnership agreement. Expenses exclusive of Miriam's compensation were 60 percent of partnership gross receipts. Miriam was to receive 25 percent of the gross receipts. Thus, in order for petitioner to receive anything, the partnership would have to earn an amount of which 15 percent (100 percent less 85 percent) is more than $13,000, Miriam's fixed salary.

[2] We have refrained from employing as a criterion the whole history of the enterprise as set forth in our findings. This has, however, been held to be permissible in determining the reasonableness of any expectations even though the experience itself was not currently available. "There is, however, substantial importance in the reasonable expectations entertained on that date. Subsequent events may serve to establish both that the expectations were entertained and also that such expectations were reasonable and intelligent. Our consideration of them has been confined to this purpose." *James Couzens,* 11 B.T.A. 1040, 1165 (1928). See also *Louise Cheney,* 22 B.T.A. 672 (1931). If we were to refer to those figures, an even more certain conclusion would result. Excluding the initial year, 4 of the

devoid of any evidence from which we can even infer that an agency with a single top executive could, under any circumstances, and over no matter how long a period, achieve any comparable gross receipts figures.

When to this it is added that petitioner was an experienced businessman, well acquainted with probabilities, and that he contributed a capital investment [3] of at least $25,000 in addition to assuming all the losses, it is impossible for us to reach the conclusion that petitioner had any significant purpose to engage in a profitable transaction. The benefit to his relative, as compared to his potential detriment if the partnership developed unprofitably, is so great that its existence seems to us sufficient to provide a motive for petitioner's action which has no reference to the expectation, hope, or purpose of operating a business or securing a profit. What we said in *Lucia Chase Ewing*, 20 T.C. 216, 228 (1953), affd. 213 F. 2d 438 (C.A. 2, 1954), seems equally applicable here:

> The petitioner's primary motive or intent in advancing funds to The Ballet Theatre, Inc. * * * was to aid in the production of the ballet as an art in America. The petitioner hoped that the ballet would become financially self-sustaining as well as an artistic success and that some profit might result from the production. The petitioner's primary motive or intent in advancing these funds during the years in question was not the earning of profits for herself, and the transactions she entered into in making the advances were not transactions entered into for profit.

Petitioner points out that his relative was not a "dependent" and he was not thereby relieved of any otherwise existing obligation of support. But the purpose to benefit her might well exist regardless of any legal obligation. There is also evidence that her earnings, both before and after the partnership, were greater than those she received while it existed. But there is nothing in the record from which we can conclude that there was any acceptable alternative open to her at the time the partnership was formed or during the year before us which would have approached the financial benefit which she achieved at that time through the partnership.

We have accordingly found as an ultimate fact that, similarly to *Ewing*, petitioner had no real purpose to operate a profitable busi-

---

[3] 8 years of the partnership show expenses prior to Miriam's compensation of more than 75 percent, so that petitioner could have received nothing. In 3 of the 4 remaining years the expenses prior to Miriam's compensation were about 70 percent, so that, including her fixed salary, the partnership would have needed gross receipts of about $250,000 before petitioner could receive anything. For the entire 8 years, expenses, together with Miriam's percentage of gross receipts, were about 100 percent of earnings, so that even before Miriam's fixed compensation and certainly after it there were no profits to which petitioner could look. In the meantime, of course, the excess of expenses, including Miriam's compensation, was proceeding consistently and petitioner was making good the deficits.

[3] Respondent contends that the $14,000 paid by petitioner for the Small contract was to be in addition to the $25,000. We find it unnecessary to pass upon this disagreement of the parties as to the effect of the Small contract payment.

ness or enter into a transaction for profit. This disposes of the issue, which is essentially factual. *McLean* v. *Commissioner*, 285 F. 2d 756 (C.A. 4, 1961), affirming a Memorandum Opinion of this Court; *Morton* v. *Commissioner*, 174 F. 2d 302 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied 338 U.S. 828.

*Decision will be entered for the respondent.*

